UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

SUSAN FOX, Individually and as Proposed
Executrix of the Estate of THOMAS FOX, deceased,

                                   Plaintiff,

                 -against-

MONSANTO COMPANY, and BAYER CROPSCIENCE, LP

                              Defendants.

---------------------------------------------------------------------------X

**COMPLAINT AND JURY DEMAND**

Civil Action No.: 2:20-cv-4962

Plaintiff SUSAN FOX, Individually and as Proposed Executrix of the Estate of THOMAS FOX, by and through her undersigned counsel, as and for causes of action against Defendants MONSANTO COMPANY ("MONSANTO") and BAYER CROPSCIENCE LP ("BAYER")(collectively "Defendants") states and alleges the following, upon information and belief:

### JURY DEMAND

1.     Plaintiff demands a trial by jury on all issues.

### PARTIES

**Plaintiff**

2.     Plaintiff SUSAN FOX ("Plaintiff"), Individually and as Proposed Executrix of the Estate of THOMAS FOX, is a citizen of the State of New York and a resident of Port Jefferson Station, New York, located in the Eastern District of New York.

3.     At all relevant times herein, and up to the time of his death on November 9, 2018, Plaintiff was lawfully married to THOMAS FOX ("Decedent").

4.     At all relevant times herein, Plaintiff is and was entitled to be named as the Executrix of the Estate of Thomas Fox, and to apply for and receive Limited Letters of Administration to represent the Estate in legal matters.

1

5. Upon the filing of this action, Plaintiff shall apply for the issuance of Limited Letters of Administration.

6. At all relevant times herein, Decedent THOMAS FOX was exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup®") and was diagnosed with Non-Hodgkins Lymphoma ("NHL"), was caused to sustain great conscious pain and suffering from the time of such diagnosis, and ultimately died as a result of such exposure on November 8, 2018.

7. That at the time of his death, Decedent had a cause of action against the defendants named herein for recovery for his pre-death conscious pain and suffering, and emotional distress, against the Defendants herein, sustained as a result of his exposure to Roundup®.

8. That Decedent's cause of action for his pre-death conscious pain and suffering, and emotional distress, has survived his death and remains a right of recovery that belongs to his Estate.

9. That the Decedent's exposure to Roundup® as aforesaid has resulted in the wrongful death of the Decedent which has caused injury and damages to the distributes of Decedent's Estate.

10. That based upon the Estates, Powers and Trusts Law of the State of New York, the distributees of the Decedent are entitled to seek recovery of damages suffered as a result of the wrongful death of the decedent as aforesaid.

11. That Plaintiff, both personally and as proposed Executrix of the Estate of THOMAS FOX, seeks recovery herein on her own behalf and as representative of the distributes of Decedent's Estate.

**Defendants**

12. Defendant Monsanto Company "Monsanto" is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri and is a wholly owned subsidiary of Bayer Cropscience, L.P. At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in the State of New York, and in the Eastern District of New York.

2

13. At all relevant times herein, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

14. Defendant Bayer CropScience LP ("Bayer") is a foreign limited partnership organized under the laws of the State of Delaware, with a principal office at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina, 27709.

15. Bayer is registered to do business in the State of New York, and can be served through its registered agent, CSC-Lawyers Incorporating Service, 80 State Street, Albany, NY 12207-2543.

16. Bayer acquired Monsanto on or around June 7, 2018, and in doing so assumed all of its preexisting liabilities.

## BACKGROUND

**Defendant MONSANTO and its Development
and use of Glyphosate Products**

17. In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

18. Since that time, Defendant Monsanto has marketed and sold Roundup®, its formulations, and derivative products, including, but not limited to: RoundUp Quick-Pro, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready- to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer

Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup®" and/or "Roundup."

19.     Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

20.     Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

21.     Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.

[2] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all.

[3] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.

agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

**Monsanto's Continued Sale of Roundup**
**(a Glyphosate Herbicide) Despite**
**Evidence of its Carcinogenic Effects**

22.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

23.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

24.    The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

---

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; see also Nat'l Pesticide Info. Center, Glyphosate: General Fact Sheet, available at http://npic.orst.edu/factsheets/glyphogen.pdf.

[6] Thomas Bohn, et. al., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201

[7] John F. Acquavella et. al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861; Kathryn Z. Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.

[8] Dirk Brändli & Sandra Reinacher, Herbicides found in Human Urine, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] See Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.

25.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

26.    More likely than not, glyphosate causes non-Hodgkin's lymphoma.

27.    More likely than not, glyphosate-based formulations cause non-Hodgkin's lymphoma.

28.    More likely than not, Roundup® causes non-Hodgkin's lymphoma.

29.    Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

30.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

31.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

32.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate

6

greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

**The Development of Roundup®**

33.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.[11]

34.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

**Registration of Herbicides under Federal Law**

35.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

---

[10] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (June 2005), *supra*

[11] *See* Monsanto, Crop Protection, https://www.cropscience.bayer.com/customer-updates/ (last visited July 13, 2020).

36.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

37.     Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

38.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

39.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States, and in the State of New York.

40.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

41.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products

through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

42.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing
and Sale of Glyphosate/Roundup**

43.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence* of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

44.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

45.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup®.

46.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

47.    Three top executives of IBT were convicted of fraud in 1983.

48.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

49.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

50.    Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000-present. These studies minimize any safety concerns about the use of glyphosate, are used to convince regulators to allow the sale of Roundup®

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFeldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C. [August 9, 1978]).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.

and are used to convince customers to use Roundup®.  Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts.  All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe.  In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts.  Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

51.     Monsanto has also violated federal regulations by holding secret *ex parte* meetings and conversations with certain EPA employees in order to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry.  Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

52.     In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

53.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study by becoming the sole provider of data and ultimately wrote the report, which was rubber-stamped by the BfR.  The Glyphosate Task Force was solely responsible for preparing and

submitting a summary of studies relied upon by the BfR. Defendant has used this report, which they wrote, to falsely proclaim the safety of glyphosate.

54.    In October 2015, the Defendant, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate and argued that the IARC classification is mistaken.   In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

**The Importance of Roundup® to**
**Monsanto's Market Dominance Profits**

55.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

56.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

57.    Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of

five to one and accounted for close to half of Monsanto's revenue.17 Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has Known for Decades That it**
**Falsely Advertises the Safety of Roundup®.**

58.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a)  Remember that environmentally friendly Roundup® herbicide is biodegradable.  It will not build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences.

(b)  And remember that Roundup® is biodegradable and will not build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you have got a weed, brush, edging or trimming problem.

(c)  Roundup® biodegrades into naturally occurring elements.

(d)  Remember that versatile Roundup® herbicide stays where you put it. That means there is no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)  This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

(f)   You can apply Roundup® with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade into natural products.

(g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

---

17 David Barboza, _The Power of Roundup; A Weed Killer is a Block for Monsanto to Build on_, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block- for-monsanto-to-build-on.html.

(i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

(j)   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[18]

59.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

(c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

(e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

60.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still has not done so today.

61.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

**Classifications and Assessments of Glyphosate**

62.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

63.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

64.    One year before the Monograph meeting, the meeting is announced and there is a call for both data and experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes their review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

65.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

---

[20] World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

(c)      representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

66.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

67.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

68.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

69.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

70.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

71.     The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposures to glyphosate.

72.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL, and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

73.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

74.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

75.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

76.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

77.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

---

[21] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, *supra* at 77.

78.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings about Glyphosate's Dangers to Human Health**

79.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate.

**Release Patterns**

80.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

---

[22] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

[23] Nat'l Pesticide Info. Center, Glyphosate: General Fact Sheet, supra.

81.      In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most reported cause of pesticide illness among agricultural workers.[24]

82.      In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

83.      In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

84.      A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

---

24 Caroline Cox, Glyphosate, Part 2: Human Exposure and Ecological Effects, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et. al., Preventing Pesticide-Related Illness in California Agriculture: Strategies and Priorities. Environmental Health Policy Program Report, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

25 Martinez, T.T. and K. Brown, Oral and Pulmonary Toxicology of The Surfactant Used in Roundup Herbicide, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

26 Julie Marc, et al., Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

27 Julie Marc, et al., Glyphosate-based pesticides affect cell cycle regulation, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

85.    In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

86.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below  agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

87.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup®.

---

[28] Francisco Peixoto, Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.
[29] Nora Benachour, et. al., Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

88.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

**Recent Worldwide Bans on Roundup®/Glyphosate**

89.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[30]

90.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[31]

91.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[32]

92.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study

---

[30] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[31] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, Global Research, May 14, 2015, available at https://www.globalresearch.ca/brazils-public- prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, MPF/DF Reforça Pedido Para Que Glifosato Seja Banido do Mercado Nacional, April 14, 2015, available at http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[32] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen", Newsweek, June 15, 2015, available at http://www.newsweek.com/france-bans-sale- monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

carried out by a leading cancer agency, the importation of weed spray Roundup® has been suspended."[33]

93.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[34]

94.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[35]

**Proposition 65 Listing**

95.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[36] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[37] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[38]

---

[33] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

[34] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate- herbicides/.

[35] Colombia to Ban Coca Spraying Herbicide Glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

[36] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.

[37] Frequently Asked Questions, State of Cal. Dept of Justice, Office of the Attorney General, available at http://oag.ca.gov/prop65/faq.

[38] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate, *supra*.

96.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

97.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[39] The law also prohibits the discharge of listed chemicals into drinking water.

98.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[40]

99.     Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an *ad hoc* committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[41] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[42]

---

[39] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

[40] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, *et al.*, No. 16- CECG-00183 (Cal. Super. Ct.).

[41] Id. at 2.

[42] Id. at 3.

Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[43]

100. On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[44] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

101. The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

102. Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[45] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

---

[43] Id.

[44] European Food Safety Auth., *Conclusion on The Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, available at http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

[45] Id.

103.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[46] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[47] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[48] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[49]

104.    The EFSA went further and noted:

*"[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the **genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or 'co-formulants.'** Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, the **EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re- assess used of glyphosate-based formulations in their own territories."[50]* (Emphasis added).*

105.    Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[51]

---

[46]EFSA      Fact      Sheet:      Glyphosate,      *EFSA*,      available      at http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[47] Id.

[48] Id.

[49] Id.

[50] Id.

[51] European Food Safety Auth., Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate, *supra*.

**Leading Scientists Dispute the EFSA's Conclusion**

106.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[52] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[53]

107.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

108.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible."

109.    The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[54]

110.    With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin lymphoma, but the EFSA

---

[52] Letter from Christopher J. Portier *et. al.* to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[53] Id.

[54] Id.

nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[55]

111.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.

112.    For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls, but was reported more than 10 years after the historical control dataset was

---

[55] Id.

developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

*"BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals."[56]*

113.    The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[57]

114.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[58]

**Statement of Concern Regarding Glyphosate-Based Herbicides**

115.    On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[59] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs,

---

[56] Id.

[57] Id.

[58] Christopher J. Portier, et al., *Differences in The Carcinogenic Evaluation of Glyphosate Between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, Journal of Epidemiology & Cmty. Health, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

[59] John P. Myers, *et al.*, *Concerns Over Use of Glyphosate-Based Herbicides And Risks Associated With Exposures: A Consensus Statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[60]

The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;
2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
3. The half-life of glyphosate in water and soil is longer than previously recognized;
4. Glyphosate and its metabolics are widely present in the global soybean supply;
5. Human exposures to GBHs are rising;
6. Glyphosate is now authoritatively classified as a probable human carcinogen; and
7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[61]

116.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[62]

117.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[63]

---

[60] Id.

[61] Id.

[62] Id.
[63] Id.

118.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[64]

119.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[65]

120.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> *"[A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs."[66]*

121.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> *"[W]e recommend that a system be put in place through which manufacturers of GBHs provide*

---

[64] Id.

[65] Id.

[66] Id.

*funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects."[67]*

**The FDA Announces Testing of Glyphosate Residue in Foods**

122.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[68]

123.    In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[69]

124.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[70]

125.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[71]

---

[67] Id.

[68] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare

[69] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38

[70] Gilliam, *supra* note 68.

[71]Id.; Pesticide Q&A, U.S. Food and Drug Administration, available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm

**European Union Vote on Glyphosate Renewal**

126.    The license for glyphosate in the European Union was set to expire in June 2016.

127.    Without extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

128.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

129.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

130.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75] Leading up to the vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.[76]

131.    On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

---

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, European Commission to Extend Glyphosate License for 18 Months, Reuters, June 28, 2016, available at http://www.reuters.com/article/us-health-eu-glyphosate- idUSKCN0ZE25B.

[73] Arthur Neslen, EU States Rebel Against Plans to Relicense Weedkiller Glyphosate, The Guardian, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[74] Id.

[75] Arthur Neslen, Vote on Controversial Weedkiller's European License Postponed, The Guardian, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.

[76] Id.

[77] Manon Flausch, Commission Prolongs Glyphosate License by 18 Months, Euractiv, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.

132.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.[78]

133.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate- based herbicides, including Roundup®.[79]

134.    On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[80]

**Decedent Thomas Fox's Exposure to Roundup®**

135.    Thomas Fox began using Roundup® at his home in the 1970s.

136.    Over the next forty years, Mr. Fox would repeatedly spray Roundup® products across his property in New York to control weeds.

137.    In 2014 after repeated and long-term exposure to Roundup®, Mr. Fox was diagnosed with non-Hodgkin's follicular B-cell lymphoma.

138.    On November 9, 2018, Mr. Fox died from metastatic disease.

139.    He was only sixty years old at the time of his death.

**AS AND FOR A FIRST CAUSE OF ACTION**
**SOUNDING IN STRICT PRODUCTS LIABILITY FOR FAILURE TO WARN**

140.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

---

[78]Arthur Neslen, Controversial Chemical in Roundup Weedkiller Escapes Immediate Ban, The Guardian, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban.

[79]Sarantis Michalopoulos, EU Agrees Ban on Glyphosate Co-Formulant, Euractiv, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant.

[80]Caterina Tano, German Vote Swings EU Decision on 5-Year Glyphosate Renewal, November 27, 2016, available at https://euobserver.com/environment/140042

141. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, supplying, formulating, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup® products, and through that conduct has knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reaches consumers, such as Decedent, who was exposed to it through ordinary and reasonably foreseeable uses.

142. Decedent was exposed to Roundup® products in the course of his personal use on gardens and lawns, without knowledge of their dangerous characteristics.

143. Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Decedent. Additionally, Monsanto expected Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach, and Roundup® did in fact reach, consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

144. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

145. At all relevant times, Roundup® was unreasonably dangerous when put to a reasonably anticipated use without knowledge of Roundup® characteristics.

146. At all relevant times, Monsanto knew or should have known that the use of Roundup® significantly increased the risk of cancer.

147. Monsanto knew or should have known that Roundup® was carcinogenic.

148. At all relevant times, Roundup® was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto, and at the time Decedent was exposed to and/or ingested the product. The defective condition of

Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

149.    Monsanto could have revised the Roundup® label to provide additional warnings.

150.    That at all relevant times herein, Monsanto assumed a strict liability to all persons whom it could reasonably foresee would be injured by the said dangerous and defective condition of the aforesaid Roundup® herbicide, which was not fit for the purpose intended.

151.    That at all times hereinafter mentioned, the aforesaid Roundup® herbicide was defectively prepared, manufactured, designed, tested, distributed, and sold by Monsanto as aforesaid, and the product was not reasonably safe for the use intended nor for any foreseeable use.

152.    The defect caused serious injury to the Decedent, who used Roundup® in its intended and foreseeable manner.

153.    Before Roundup® left the control of Monsanto, it failed to provide adequate warning or instruction to consumers, including Decedent, that Roundup® was unreasonably dangerous and had possible side effects, including, but not limited to, developing NHL.

154.    The Decedent did not substantially alter Roundup® in any manner that would not be reasonably foreseeable.

155.    That the Decedent exercised reasonable care in the use of the aforesaid Roundup® herbicide, and was not aware of any carcinogenic effects with respect to same in the course of its usual and customary use, nor did he perceive any danger.

156.    That the Decedent exercised reasonable care in the use of the aforesaid product, and used it for the purpose and in the manner for which it was intended.

157.    That at all times hereinafter mentioned, the Decedent was and is covered by, and included in, the aforesaid strict liability assumed by the defendants.

158.    That the defective design, testing, manufacture, preparation and sale of the aforesaid product, were substantial factors in bringing about the injuries and death to the Decedent.

159.    That as the sole and direct result of the foregoing, Decedent has sustained damaged in an amount exceeding the jurisdictional limits of all lower courts.

160.    Monsanto manufactured, designed, and produced Roundup®, and introduced Roundup® into interstate commerce without providing any adequate warning as to the unreasonably dangerous and carcinogenic properties of Roundup®, and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

161.    Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

162.    Monsanto knew of the probable consequences of Roundup®. Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks of developing NHL from Roundup® exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution.  Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Decedent's safety.

163.    The above allegations taken together show Monsanto did not behave in a reasonably prudent manner when Monsanto failed to adequately warn Decedent of the unreasonably dangerous and cancer-causing nature of Roundup®.

164.    Due to the absence of any warning or instruction by Monsanto as to the significant health and safety risks posed by Roundup®, as described herein, Decedent was unaware that Roundup® was unreasonably dangerous, had carcinogenic properties, and had the propensity to cause or serve as a substantial contributing factor in the development of NHL, as this danger was not known to the general public.

165. Decedent's Estate has been and continues to be damaged as a direct result of Roundup® being sold without an adequate warning.

166. Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

167. The Decedent reasonably relied on the skill, superior knowledge, and judgment of Monsanto.

168. Had Monsanto properly disclosed the risks associated with Roundup®, the Decedent would have avoided the risk of NHL by not using Roundup®.

169. The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

170. To this day, Monsanto has failed to adequately warn of the true risks of injuries associated with the use of and exposure to Roundup®.

171. As a direct and proximate result of Monsanto's failure to warn the Decedent of the increased risk of NHL associated with Roundup®, the Decedent developed cancer and died.

172. That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for damages for decedent's pre-death mental

anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

173. That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from Decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

174. The above misconduct of Monsanto constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Defendant in a sum that will deter Defendant and others from such misconduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION
## SOUNDING IN STRICT PRODUCTS LIABILITY FOR NEGLIGENT DESIGN

175. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

176. At all relevant times, Monsanto was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup® into the stream of interstate commerce.

177. Monsanto sold and distributed Roundup® throughout the United States.

178. Monsanto marketed and advertised Roundup® for use by consumers, including Decedent.

179. At all relevant times, Monsanto expected Roundup® to reach consumers, including Decedent.

38

180. Roundup® did reach Decedent without any unforeseeable or substantial change in condition.

181. At all relevant times, Roundup® was negligently and defectively designed and formulated, otherwise in a defective condition, and not reasonably safe, at the time it was marketed, distributed and sold by the Defendants, and unreasonably dangerous when put to a reasonably anticipated use.

182. At all relevant times, Decedent used Roundup® in a manner reasonably anticipated.

183. Using Roundup® as a broad-spectrum herbicide is a reasonably foreseeable, anticipated, common, and ordinary use of Roundup®.

184. Monsanto had a duty to create a product that was not and is not unreasonably dangerous for its normal, intended use.

185. At all relevant times herein, Monsanto marketed and promoted Roundup® in such a manner so as to make it inherently defective by downplaying its suspected, probable, and established health risks inherent with its normal, intended use.

186. The significant risks to the health and safety of consumers of Roundup® existed at the time Roundup® left Monsanto's control.

187. At all relevant times herein, Monsanto knew that the design and formulation of Roundup® were more dangerous than what an ordinary consumer, using Roundup® in its anticipated and foreseeable use, would expect or anticipate.

188. The above allegations taken together show Monsanto did not behave in a reasonably prudent manner.

189. Decedent's Estate has been and will continue to be damaged as a direct result of the Roundup® product which was sold to him in a defective condition, on all occasions in which it was sold to him as a result of Monsanto's marketing and distribution of same.

190. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup® left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

191. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached its intended users, including Decedent, in the same defective and unreasonably dangerous condition in which Monsanto's Roundup® was manufactured.

192. Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers, and to Decedent in particular, and Monsanto is therefore strictly liable for the injuries sustained by Decedent.

193. Decedent could not, by the exercise of reasonable care, have discovered the defects of Roundup® herein mentioned or perceived its danger.

194. Monsanto is thus strictly liable to the Decedent's Estate for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

195. Monsanto's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct.

196. Defects in Monsanto's Roundup® were the cause or a substantial factor in causing Decedent's injuries.

197. As a direct and proximate result of the defective design and manufacture of Roundup®, Decedent developed cancer and died at the young age of sixty.

198. That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for damages for decedent's pre-death mental

anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

199.    That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

200.    The above misconduct of Monsanto constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Defendants, jointly and severally, in a sum that will deter Defendants and others from such misconduct in the future.

**AS AND FOR A THIRD CAUSE OF ACTION**
**SOUNDING IN COMMON LAW NEGLIGENCE**

201.    Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

202.    At all relevant times, Monsanto breached their duty to exercise reasonable care towards Decedent.

203.    Monsanto failed to use ordinary care to adequately warn Decedent of the risk of harm from, or the hazards associated with, the use of Roundup®.

204.    Monsanto failed to use ordinary care to manufacture and design Roundup® to be reasonably safe.

205.    Monsanto failed to properly test Roundup® to determine adequacy and effectiveness of safety measures, if any, prior to releasing Roundup® for consumer use.

41

206.    Monsanto failed to properly test Roundup® to determine the increased risk of cancer during the normal and/or intended use of Roundup®.

207.    Monsanto failed to inform the public in general, and Decedent in particular, of the known dangers of using Roundup®.

208.    Monsanto marketed and labeled Roundup® as safe for all uses despite knowledge to the contrary.

209.    Monsanto failed to act like as reasonably prudent company would under similar circumstances.

210.    Monsanto failed to use a safer alternative in Roundup®.

211.    At all relevant times, Monsanto knew or should have known that Roundup® was unreasonably dangerous and defective when put to its reasonably anticipated use.

212.    Each and all of the above acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Decedent's Estate.

213.    As a direct and proximate result of Monsanto's failures and negligence, Decedent purchased and used Roundup® that directly and proximately caused Decedent to develop cancer and die. As a direct and proximate result, Decedent, before his death, and thereafter, Decedent's Estate, sustained damage and was caused to incur medical bills, lost wages, and/or conscious pain and suffering.

214.    That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for damages for Decedent's pre-death mental anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

215.    That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff,

42

on behalf of Decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from Decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

216. The above misconduct of Monsanto constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Monsanto in a sum that will deter Defendant and others from such misconduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

217. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

218. Defendants sold Roundup® to Decedent who bought Roundup® and was reasonably expected to use Roundup®.

219. At all relevant times, Defendants knew or should have known that Roundup® was unreasonably dangerous and defective when put to its reasonably anticipated use.

220. At all relevant times, Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that Roundup® was safe and effective for reasonably anticipated uses.

221. Defendants' representations were made to induce the Decedent to purchase Roundup®.

222. Defendants' representations were a material factor in the Decedent's decisions to purchase Roundup®.

223. At all relevant times, Roundup® did not conform to these express representations because Roundup® can cause serious injury, including cancers such as NHL.

43

224.     As a direct and proximate result of the Defendants' breach of warranty, the Decedent purchased and used Roundup®, which directly and proximately caused Decedent to develop cancer.

225.     That as a result of the foregoing, the Decedent, in the first instance, and the Decedent's Estate, were caused to incur medical bills, lost wages, and/or conscious pain and suffering as a direct and proximate result of Defendant's above listed conduct.

226.     That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of decedent's Estate, for damages for decedent's pre-death mental anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

227.     That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

228.     The above misconduct of Defendants constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**<u>FOR BREACH OF IMPLIED WARRANTIES</u>**

229.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

230.   Defendants sold Roundup® to the Decedent, who bought Roundup® and was reasonably expected to use or be affected by Roundup®.

231.   Decedent reasonably relied upon Defendants' marketing, advertising, and labeling of Roundup® as a material factor in the decision to purchase Roundup®.

232.   The Decedent reasonably relied on Defendants' skill and sophistication within the field of manufacturing and selling Roundup® as a material factor in the decision to purchase Roundup®.

233.   At the time the Defendants manufactured, marketed, labeled, promoted, distributed, and/or sold Roundup®, Defendants knew of the uses for which Roundup® was intended and was ordinarily used.

234.   Because of each and all of the above allegations, taken individually or in whole, Defendants impliedly warranted Roundup® to be of merchantable quality and safe for such use.

235.   Roundup® was not fit for the common, ordinary, and intended uses.

236.   Defendants breached their implied warranties of Roundup® to Decedent because Roundup® was not fit for the common, ordinary, and intended uses.

237.   That as a result of the foregoing, Defendants breached New York Uniform Commercial Code §2-314's Implied Warranty of Merchantability with respect to the Roundup® herbicide.

238.   As a direct and proximate result of Defendants' breach of implied warranties, the Decedent purchased and used Roundup®, which directly and proximately caused him to develop NHL and die.

239.   As a result, Decedent, and Decedent's Estate, were caused to incur medical bills, lost wages, and/or conscious pain and suffering.

240.   That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for damages for Decedent's pre-death mental

anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

241.   That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

242.   The above misconduct of Defendants constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION
### FOR NEGLIGENT MISREPRESENTATION

243.   Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

244.   As a direct, foreseeable, and proximate result of the Defendants' fraudulent conduct, Decedent purchased and used Roundup®.

245.   As a direct and proximate result of such use, Decedent developed cancer, and Decedent, and thereafter Decedent's Estate, were caused to incur medical bills, lost wages, and Decedent underwent conscious pain and suffering up from the time of his diagnosis with NHL, up through the time of his death.

246.   Defendants had a duty to accurately and truthfully represent to the public, Decedent, and the medical and healthcare community, that Roundup® had not been tested and had not been found to be safe and effective.

247.    Defendants breached their duty by representing to Decedent, and all potential users of Roundup®, that Roundup® was safe for use.

248.    The misrepresentations and/or material omissions, and concealments concerning Roundup® made by the Defendants are as follows, the Defendants failed to:

   a. Conduct sufficient testing which, if properly performed, would have shown that Roundup® had serious side effects, including cancer, and warn users of those risks; and/or

   b. Include adequate warnings with Roundup® that would alert users to the potential risks and serious side effects; and/or

   c. Warn Decedent that use of Roundup® carried a risk of death or cancer and other serious side effects; and/or

   d. Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Roundup®;

   e. Provide Decedent with other appropriate warnings.

249.    The above misrepresentations, concealments, or omissions were of the type that would ordinarily cause a reasonable person, including Decedent, to discontinue to purchase and cease use of Roundup®.

250.    At all relevant times, Defendants' misrepresentations, omissions, and concealments concerned material facts.

251.    At all relevant times, Defendants failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of Roundup®.

252.     At all relevant times, Defendants failed to disclose facts indicating that Roundup® was inherently dangerous and carcinogenic in nature.

253.    At all relevant times, Defendants failed to exercise reasonable care in communicating the information concerning Roundup® to Decedent and/or concealed relevant facts that were known to Defendants.

254. Defendants' marketing, advertising, and soliciting business plans demonstrate that Defendants concealed the material facts in order that consumers, including Decedent, continue to purchase and use Roundup®.

255. The representations made by Defendants, in fact, were false.

256. At all relevant times, Decedent was not aware of the falsity of the foregoing misrepresentations.

257. Decedent was not aware that material facts concerning Roundup® had been concealed or omitted.

258. As a result of Defendants' misrepresentations, omissions, and/or concealments, Decedent purchased and used Roundup®.

259. Decedent reasonably and justifiably relied on Defendants' misrepresentations and/or omissions as those made by sophisticated and skilled suppliers, manufacturers, and/or sellers of Roundup®.

260. Decedent reasonably and justifiably relied on misrepresentations and/or omissions made by Defendants, who were in a position to know the material facts concerning Roundup®, and the association between Roundup® and the incidence of cancer.

261. If the Defendants had disclosed true and accurate material facts concerning the risks of the use of Roundup®, in particular the risk of developing cancer from using Roundup®, Decedent would not have purchased, and/or received Roundup®, and/or used Roundup®.

262. At all relevant times, the Defendants' corporate officers, directors, and/or managing agents knew of and ratified the acts of Defendants, as alleged herein.

263. As a direct and proximate result of Defendants' conduct, Decedent developed NHL and died.

264.    That as a result of the foregoing, Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of decedent's Estate, for damages for decedent's pre-death mental anguish, and conscious pain, and suffering, in an amount exceeding the jurisdictional limits of all lower courts.

265.    That as a result of the foregoing, Decedent's distributees have been damaged and demand judgment against Defendants, and each of them jointly and severally, are liable to Plaintiff, on behalf of Decedent's Estate, for all pecuniary and other wrongful death damages suffered by Decedent's distributees resulting from decedent's death, together with the costs, disbursements and attorney's fees incurred in this action, as well as pre-judgment interest upon the sum awarded, in an amount exceeding the jurisdictional limits of all lower courts.

266.    The above misconduct of the Defendants constitutes a gross indifference and a willful, wanton, malicious, oppressive, and reckless disregard for the safety of the general public, including Decedent, thus justifying and requiring punitive damages to be assessed against Defendants in a sum that will deter Defendants and others from such misconduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR LOSS OF CONSORTIUM

267.    Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

268.    At all relevant times herein, Susan Fox and Thomas Fox were lawfully married.

269.    As the wife of Thomas Fox, Susan Fox was and is legally entitled to the services and consortium of her spouse.

270.    As a result of the serious physical injuries and death sustained by Thomas Fox, Susan Fox has sustained damages by reason of the loss of services and consortium of her spouse.

271.   As the sole and direct result of the foregoing, Plaintiff Susan Fox has sustained damages in an amount exceeding the jurisdictional limits of all lower courts and demands recovery from the defendants therefor.

WHEREFORE, Plaintiff demands judgment along with costs, disbursements and attorney fees as follows:

(1)   Upon each of the foregoing Causes of Action One through and including Seven, for compensatory pre-death pain and suffering damages, wrongful death damages, and punitive damages, in an amount exceeding the jurisdictional limits of all lower courts, and demands recovery from the defendants therefor;

(2)   Prejudgment and post-judgment interest;

together with such other and further relief as the court may deem just and proper.

DATED:   Purchase, New York
            October 15, 2020

Yours, etc.,

*Luis F. Ras*

_____
Luis F. Ras, Esq.
RAS ASSOCIATES, PLLC
Attorneys for Plaintiff
2500 Westchester Avenue, Suite 410
Purchase, NY 10577
(914) 289-2909